UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
LETICIA ROCHELLE ANDERSON,                        :
                                                  :
                        Plaintiff,                :
                                                  :     **OPINION AND ORDER**
            -against-                             :     14-CV-6937 (DLI)
                                                  :
NANCY A. BERRYHILL,[1]                            :
Acting Commissioner of Social Security,           :
                                                  :
                        Defendant.                :
----------------------------------------------------------------x

**DORA L. IRIZARRY, Chief United States District Judge:**

On April 4, 2011, Plaintiff Leticia Rochelle Anderson ("Plaintiff") filed an application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act (the "Act"), alleging an inability to work because of Attention Deficient Hyperactivity Disorder ("ADHD"), depression, Hepatitis C, and Opiate Dependence. *See* Certified Administrative Record ("R."), Dkt. Entry No. 12 at 146-55, 192.[2] Her claim was denied and she requested a hearing. *Id.* at 65, 70-74, 82-84. On March 12, 2013, Plaintiff appeared with counsel at a hearing before Administrative Law Judge Hilton R. Miller (the "ALJ"). *Id.* at 42-64. In a decision dated March 20, 2013 ("ALJ Decision"), the ALJ concluded that Plaintiff was not disabled within the meaning of the Act. *Id.* at 17-34. On September 25, 2014, the ALJ's decision became the Commissioner's final decision when the Appeals Council denied Plaintiff's request for review. *Id.* at 1-6. This appeal followed.

Plaintiff filed the present appeal seeking judicial review of the denial of benefits, pursuant to 42 U.S.C. § 405(g), on November 26, 2014. *See* Complaint ("Compl."), Dkt. Entry No. 1. On

---

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social Security. Therefore, the Court has substituted her as the named Defendant pursuant to Federal Rule of Civil Procedure 25(d).

[2] Plaintiff's application was given a protective filing date of March 24, 2011. *Id.* at 188.

April 27, 2015, the Commissioner moved for judgment on the pleadings under Rule 12(c) of the

Federal Rules of Civil Procedure, seeking affirmance of the denial of SSI. *See* Mem. of Law in

Supp. of Def.'s Mot. for J. on the Pleadings ("Def. Mem."), Dkt. Entry No. 14. On May 27, 2015,

Plaintiff opposed the Commissioner's motion and cross-moved for a judgment on the pleadings,

asking that this Court reverse the Commissioner's determination that she is not disabled and that

the matter be remanded for further administrative proceedings. *See* Mem. of Law in Supp. of Pl.'s

Mot. for J. on the Pleadings & in Opp. to Def.'s Mot. for J. on the Pleadings ("Pl. Mem."), Dkt.

Entry No. 16. The Commissioner replied on June 11. 2015. *See* Reply Mem. of Law in Supp. of

Def.'s Mot. for J. on the Pleadings & in Opp. to Pl.'s Cross-Mot. for J. on the Pleadings ("Def.

Reply"), Dkt. Entry No. 17.

For the reasons set forth below, the Commissioner's motion for judgment on the pleadings

is denied, Plaintiff's motion is granted, and this action is remanded to the Commissioner for

additional proceedings consistent with this Opinion and Order.

## BACKGROUND[3]

### A.  Non-Medical and Self-Reported Evidence

Some contextual points of Plaintiff's history are, at best, unclear. She was married but lives

with her fiancé in an apartment in the Bronx. R. at 161-62, 182, 187, 191, 423, 426. She also

receives correspondence at an address in Brooklyn.[4] *See Id*. at 1. Plaintiff has claimed to have

completed her high school education in both 1986 and in 2001. *Id*. at 193, 424. During her time in

---

[3] Having thoroughly and carefully reviewed the administrative record, the Court finds the Commissioner's factual background accurately represents the relevant portions of said record. As such, the following background is taken substantially from "The Administrative Record" section of the Commissioner's brief, except as otherwise indicated.

[4] Given the lapse in time, it is possible that Plaintiff moved, but the record is unclear.

high school, Plaintiff both asserts that she took special education classes because of learning disabilities and denies ever being enrolled in such classes. *Compare Id*. at 193, *with Id*. at 348.

What is clear is that Plaintiff was born in 1967 and that she was 43 years old when she applied for SSI. *Id*. at 146. As she tells her story, her past is marred by personal difficulties, tragedies, and crime. At age 7, she was molested by her uncle. *Id*. at 423. By age 15, she was a mother. *Id*. at 424. Plaintiff's mother asked another family member to raise her baby and, as a result, the relationship between Plaintiff and her mother deteriorated. *Id*. By age 16, Plaintiff was drinking beer and using cocaine and marijuana, and by age 18, she was using heroin. *Id*. After abandoning her education, she engaged in prostitution and was raped on multiple occasions. *Id*. at 424, 426. She has been arrested repeatedly for narcotics offenses and has a history of homelessness. *Id*. at 425-26. Plaintiff was employed as a cashier at McDonald's from December 2004 to December 2005, and at Panera Bread from January 2006 to December 2006. *Id*. at 193. She has been unemployed since leaving Panera Bread. *See Id*. at 171-78, 192-93.

On April 18, 2011, Plaintiff completed an Initial Function Report ("IFP"). *Id*. at 162-79. In her own words, she complained that her "mood [was] the main thing that affects [her] ability to do things." *Id*. at 163. As a result, she "just [does not] feel like doing anything at all." *Id*. She could not sleep through the night, and suffered from nightmares. *Id*. She did not report any problems concerning personal care beyond difficulty remembering her medication schedule. *Id*. at 164. Plaintiff made daily trips to a Methadone Maintenance Treatment Program ("MMTP") and had no problem traveling by herself. *Id*. at 165, 167. She could prepare meals, shop, and manage her personal finances. *Id*. at 164, 166. She admitted having problems getting along with other people and has "always been" antisocial, but does not have trouble with people in positions of authority. *Id*. at 167, 169. Yet, in contrast to being antisocial, Plaintiff also notes that she "like[s] to talk." *Id*.

at 168. She also stated that she enjoys dancing. *Id*. at 166. Plaintiff reported that she "always" has had trouble paying attention and finishing tasks. *Id*. at 169. Plaintiff can follow directions, but has difficulty, "if it's a lot to remember." *Id*. at 169-70.

## B.    Plaintiff's Testimony Before the ALJ

Plaintiff first appeared for a hearing before the ALJ on December 4, 2012. *Id*. at 37-41. At that hearing, Plaintiff indicated a desire to proceed with representation and the ALJ adjourned the hearing. *Id*. at 40. Plaintiff secured representation shortly thereafter and the hearing continued on March 12, 2013 ("March 12 Hearing"). *Id*. at 42-64.

At the March 12 Hearing, Plaintiff testified that she cannot sleep if she does not take her medication. *Id*. at 50. When she is able to sleep, she has nightmares and flashbacks to her past. *Id*. She reiterated that she has trouble remembering to take her medication and perform various tasks during the day. *Id*. at 52-53. When she does remember to take her medication during the day, the side effects make her feel "sluggish, fatigued," and "always [in need of] naps." *Id*. at 52. She claimed to have hallucinations and the ability to hear people's thoughts. *Id*. at 55. She testified that she does not like to speak with people because "they don't understand," and her frustration with her inability to communicate has led to physical confrontations in the past. *Id*. at 54. In fact, she admitted to fighting with individuals at her jobs at McDonald's and Panera Bread. *Id*.

## C.    Vocational Expert's Testimony Before the ALJ

Louis Szollsy, Jr. appeared via telephone as a Vocational Expert ("VE") at the March 12 Hearing. *Id*. at 44, 57-64. He testified that Plaintiff's past positions in the fast food industry were "unskilled" and required "light exertion." *Id*. at 60.

The first hypothetical the ALJ posed to the VE ("Hypo #1") was that of an individual with Plaintiff's "age, education, and work experience, and a residual functional capacity [("RFC")] to

perform work at all exertional levels," but added limitations that: (1) the tasks performed must be simple, routine and repetitive; (2) the position requires only simple decisions; (3) there are only occasional changes in routine; (4) there is only "brief and superficial contact with others;" and (5) the position is "entry level and unskilled in nature." *Id*. at 60-61. The VE stated that the individual in Hypo #1 could not perform Plaintiff's past relevant work, as those positions required interacting with other people. *Id*. at 61. However, the VE did identify three positions that such an individual could perform. First, the VE identified the position of "garment folder,"[5] an unskilled job in retail, which had 400,000 available nationally and 13,000 regionally. *Id*. Alternatively, the VE stated that the individual in Hypo #1 also could perform the duties of a "garment sorter,"[6] which had 230,000 jobs available nationally and 6,000 regionally. *Id*. Finally, the VE said that the individual in Hypo #1 also could meet the requirements of a "ticket printer/tagger,"[7] which had 230,000 jobs available nationally and 5,000 regionally. *Id*. at 61-62.

The ALJ then modified the characteristics of the person in Hypo #1, positing a person with all of the aforementioned characteristics, but adding the fact that the individual "would be off task [twenty] percent of the time" ("Hypo #2"). *Id*. at 62. With this added limitation, the VE testified that the individual described in Hypo #2 would not be employable competitively. *Id*.

At this juncture, Plaintiff's counsel asked the VE to consider a modification to the characteristics described in Hypo #1. *Id*. at 63. In this scenario, counsel asked the VE to consider the restrictions described in Hypo #1 and add to them the "need for supervision to remember instructions" ("Att'y Hypo"). *Id*. The VE explained that, if there were a consistent need for

---

[5] The ALJ noted in her decision that this job title is listed in the U.S. Department of Labor's *Dictionary of Occupational Titles* at Code 789.687-066. *Id*. at 29.

[6] This job title is listed in the *Dictionary of Occupational Titles* at Code 222.687-014. *Id*.

[7] This job title is listed in the *Dictionary of Occupational Titles* at Code 652.685-094. *Id*.

supervision in performing "rudimentary and elementary" tasks, the person in the Att'y Hypo would not be "employable in the national economy." *Id.*

## D.     Summary of the Medical Evidence

Plaintiff was admitted to an outpatient MMTP at Beth Israel Medical Center to deal with her substance abuse problems relating to cocaine and heroin on February 2, 2010. *Id.* at 471, 474-75, 543-44. In August 2010, she was evaluated at FEGS/WeCARE.[8] *Id.* at 254-97. She reported no occupational or vocational training. *Id.* at 264. She also reported that she did not have any mental health problems, did not suffer from hallucinations, engaged in a wide range of daily activities, and had no limitations in traveling. *Id.* at 262-63. Dr. Hun Han ("Dr. Han"), a hospital physician, physically examined Plaintiff and noted unremarkable findings. *Id.* at 268-69. Dr. Han diagnosed Plaintiff with Hepatitis C, anemia, and MMTP for substance addiction. *Id.* at 272. He also determined that Plaintiff had no work related restrictions and that she was employable without limitation. *Id.* at 270, 272, 278-79.

Later that year, on September 7, 2010, Plaintiff presented at CIS Counseling Center, Inc. ("CIS"). *Id.* at 365-66. On her Screening Form, Plaintiff indicated that the reasons for her visit were depression, anxiety, poor sleep, mood swings, frustration, restlessness, "lack of pleasure," and a desire to "work on personal growth [and] maintain sobriety." *Id.* at 365. On September 10, 2010, she was interviewed by Renee Roberts ("Roberts"), a therapist at CIS. *Id.* at 243-47. During the session, Plaintiff complained of mood swings and "extreme stress reactions" to the

---

[8] The Federation Employment & Guidance Service ("FEGS"), the organization which administered WeCARE in August 2010, filed for bankruptcy on March 18, 2015. *See* FEGS, http://www.fegs.org/ (last visited Mar. 21, 2017). WeCARE is a creature of the New York City Human Resources Administration and, according to the New York City website, "serves public assistance clients who have medical or psychological barriers to self-sufficiency. Contracted service providers evaluate clients and provide ongoing services, if needed." *WeCARE Services for Public Assistance Clients*, CITY OF NEW YORK, http://www1.nyc.gov/nyc-resources/service/2738/wecare-services-for-public-assistance-clients (last visited Mar. 21, 2017); *see also WeCARE*, FEDCAP, http://www.fedcap.org/content/wecare (last visited Mar. 21, 2017).

requirements of the WeCARE program. *Id*. at 243. She stated that her medical problems were Hepatitis C, low blood pressure, anemia, and poor sleep. *Id*. at 245. She also reported a history of substance abuse, rape, and homelessness since turning age sixteen years old. *Id*. at 244-46. Plaintiff was not suicidal and did not experience hallucinations. *Id*. at 245. Roberts observed that Plaintiff was oriented and cooperative, related well, goal directed, and that her judgment and insight were fair. *Id*. Roberts diagnosed Plaintiff with Generalized Anxiety Disorder ("GAD"), Opioid Dependency, and polysubstance dependence on Axis I; there was no diagnosis for Axis II. *Id*. at 247. Roberts identified unemployment as a moderate stressor (Axis IV), and rated Plaintiff's Global Assessment of Functioning ("GAF") at 57. *Id*. Roberts concluded that Plaintiff would benefit from weekly psychotherapy sessions to help her cope with stress and support her goals. *Id*. On September 28, 2010, Roberts developed an Initial Treatment Plan for Plaintiff to help her build life skills, learn to deal with stress, aid in controlling her substance abuse habits, and quit smoking. *Id*. at 418-22. Roberts saw Plaintiff approximately once a week at CIS from September 2010 until August 2, 2011. *See Id*. at 363-64, 372-423, 442, 444-45.

On October 14, 2010, Plaintiff began seeing Mamid Moussavian, M.D. ("Dr. Moussavian"), a psychiatrist at CIS. *Id*. at 238-42. At that meeting, Dr. Moussavian observed that Plaintiff was cooperative, made good eye contact, and that her speech was fluent, slow, relaxed, and goal oriented. *Id*. at 238. Her thought processes also were logical, relevant, and goal oriented. *Id*. While Plaintiff was anxious, she was not depressed, paranoid, or suffering from looseness of association. *Id*. at 238-39. Her memory was intact, oriented to time, place, and person, and did not suffer from hallucinations, delusions, or suicidal/homicidal thoughts. *Id*. at 239-40. Dr. Moussavian assessed Plaintiff's judgment, insight, reality testing, attention and concentration as fair. *Id*. at 240. He determined that her frustration tolerance and impulse control were poor. *Id*. Dr.

Moussavian ultimately diagnosed Plaintiff with GAD, Post-Traumatic Stress Disorder ("PTSD"), rule out Attention Deficit Disorder ("ADD"), and Opioid Dependence on Axis I, noted "severe" on Axis IV, and rated her GAF at 55. *Id*. at 241. He recommended continued individual psychotherapy to help with her vocational rehabilitation application. *Id*. Dr. Moussavian saw Plaintiff approximately once a month from October 2010 until August 4, 2011. *Id*. at 363-64.

In a New York State Educational Department Vocational and Educational Services for Individual with Disabilities ("VESID") Form dated October 28, 2010, Dr. Moussavian reported that Plaintiff wanted to go to school to become a Credentialed Alcoholism and Substance Abuse Counselor ("CASAC") and that her work ability estimate was "good." *Id*. at 467-68.

On December 10, 2010, Plaintiff saw Dr. Moussavian and complained that she had been feeling more anxious and having difficulty sleeping and focusing. *Id*. at 395. Dr. Moussavian prescribed Ritalin, Lexapro, and Seroquel and instructed Plaintiff to continue her psychotherapy. *Id*. In that day's Treating Physician's Wellness Plan Report Form, Dr. Moussavian reiterated his diagnoses of depression, GAD, and Opioid Dependence based upon his examination and concluded that Plaintiff was "unable to work for at least [twelve] months." *Id*. at 302-03.

Less than a month later, on December 24, 2010, Dr. Moussavian completed another VESID Form, which repeated his previous findings and the determination from the October 2010 VESID Form that Plaintiff's work ability estimate was "good." *Id*. at 465-66. Plaintiff was friendly and cooperative, related well, and fully oriented. *Id*. at 465. Similarly, Plaintiff's speech was fluent, clear, and goal oriented. *Id*. Although her mood was sad and her affect was both sad and anxious, her thought processes were coherent and free of any evidence of a thought disorder or suicidal/homicidal ideation. *Id*. Dr. Moussavian noted that Plaintiff was "intelligent." *Id*.

On December 28, 2010, Roberts completed a CIS Treatment Plan Review Form. *Id*. at 413-17. The notes on this form indicated that Plaintiff was positive, had remained sober, and was dealing successfully with her stressors without reverting to drug use. *Id*. at 413. Plaintiff anticipated enrolling in a CASAC program through VESID in January 2011. *Id*. at 415. Approximately one week later, on January 7, 2011, Plaintiff saw Dr. Moussavian and reported that her medications were helping her cope with her anxiety and depression, and that she was able to concentrate better. *Id*. at 390. According to a Progress Note prepared by Roberts on January 28, 2011, Plaintiff was approved for a CASAC program and expected to begin the program in February 2011. *Id*. at 387.

During a meeting on February 25, 2011, Plaintiff informed Dr. Moussavian that she had stopped taking her medications approximately one week before their meeting; he directed her to resume the regimen. *Id*. at 384. In the Treating Physician Wellness Plan Report Form from that day, Dr. Moussavian reiterated his diagnoses of depression, GAD, and Opioid Dependence. *Id*. at 304. Plaintiff was prescribed Ritalin, Lexapro, and Inderal; Risperdal was being discontinued and Abilify was to be started. *Id*. Mirroring his December 10, 2010 report, Dr. Moussavian indicated that Plaintiff was "unable to work for at least [twelve] months." *Id*. at 305.

On March 28, 2011, Roberts completed another CIS Treatment Plan Review Form. *Id*. at 408-12. The notes on this form indicated that Plaintiff was no longer on Suboxone and that she had begun to experience menopause. *Id*. at 408.

During another appointment on April 7, 2011, Plaintiff told Dr. Moussavian that her medications were proving very helpful. *Id*. at 380. Plaintiff seemed less anxious and exhibited no signs of a thought disorder. *Id*. Later that month, Plaintiff told Roberts that she was stressed and

unable to sleep in anticipation of an upcoming court appearance concerning child custody. *Id*. at 378-79.

On April 29, 2011, Dmitri Bougakov, Ph.D. ("Dr. Bougakov"), conducted a consultative psychiatric examination. *Id*. at 309-12. Plaintiff reported that she last worked in 2007, as a restaurant cashier, and that she stopped working because of her depression. *Id*. at 309. She began seeing a psychiatrist (Dr. Moussavian), once a month since October 2010. *Id*. Her medications at the time were Ritalin, Lexapro, Risperidone, and Abilify. *Id*. She had difficulty falling asleep, dysphoric moods, loss of interest, low energy, difficulty concentrating, diminished sense of pleasure, and thoughts about sexual assault and rape. *Id*. She claimed she was forgetful and had poor concentration. *Id*. She recounted her history of substance abuse, treatment, crime, and incarceration. *Id*. at 310. She performed her activities of daily living without any assistance. *Id*. at 311. Dr. Bougakov noted that Plaintiff was cooperative and related adequately. *Id*. at 310. However, she was lethargic and she made poor eye contact. *Id*. Her speech was monotonous and rasping, but her expressive and receptive language were adequate. *Id*. She was oriented to person, place, and time, and her thought processes were coherent and goal oriented. *Id*. Dr. Bougakov noted that Plaintiff's attention and concentration were mildly impaired. *Id*. at 311. Her affect was flat and her mood was dysthymic. *Id*. at 310. She was able to count and perform simple calculations, but made mistakes in doing serial threes. *Id*. at 311. Her intellectual functioning was in the average to below average range, her knowledge was limited, her memory skills were mildly impaired, and her insight and judgment were fair. *Id*. Dr. Bougakov diagnosed Opioid Dependency (in early remission), depressive disorder not otherwise specific ("NOS"), and PTSD on Axis I. *Id*. at 312. He determined that Plaintiff could understand and follow simple directions, perform simple tasks (with some sporadic supervision), maintain attention and concentration, and keep a regular

schedule on a limited basis. *Id*. at 311. As a result of her psychiatric symptoms, she was limited in her abilities to learn new tasks, perform complex tasks, make decisions, relate with others, and deal with stress. *Id*.

On or about May 11, 2011, Mariano Apacible, M.D. ("Dr. Apacible"), a New York State psychiatric consultant, completed a Psychiatric Review Technique Form ("PRTF"), based on the evidence in the record, as part of the initial determination of Plaintiff's disability claim. *Id*. at 317-24. Dr. Apacible found that Plaintiff's depressive disorder, PTSD, and substance abuse did not meet or equal Sections 12.04 (affective disorders), 12.06 (anxiety related disorders), or 12.09 (substance addiction disorders), in the Listings. *Id*. at 317-20. While he found that Plaintiff had no restrictions on the activities of daily living and no episodes of deterioration, he did find moderate difficulties in maintaining social functioning and mild difficulties in maintaining concentration, persistence or pace. *Id*. at 321.

In a Mental Residual Capacity Assessment Form ("MRCAF"), Dr. Apacible assessed that Plaintiff was not significantly limited in: understanding, remembering, and carrying out very short and simple instructions; performing activities within a schedule, maintaining regular attendance, and being punctual within customary tolerances, sustaining an ordinary routine without supervision, working in coordination with or proximity to others without being distracted, interacting appropriately with the public, asking simple questions and requesting assistance, accepting instructions and responding appropriately to criticism from supervisors, getting along with coworkers or peers without distracting them or exhibiting behavior extremes, maintaining socially appropriate behavior and adhering to basic standards of cleanliness and neatness, responding appropriately to changes in the work setting, being aware of normal hazards and taking appropriate precautions, and traveling in unfamiliar places of using public transportation. *Id*. at

313-14. Dr. Apacible assessed that Plaintiff was moderately limited in remembering locations and work-like procedures, understanding, remembering, and executing detailed instructions, maintaining attention and concentration for extended periods of time, completing a normal workday and workweek without interruptions from psychologically based symptoms and performing at a consistent pace without an unreasonable number and length of rest periods, and setting realistic goals or making plans independently of others. *Id*. at 313-14. Dr. Apacible observed no marked limitations and determined that Plaintiff had the requisite mental residual functional capacity to perform simple work. *Id*. at 315.

At a May 3, 2011 appointment, Plaintiff complained of nightmares and Dr. Moussavian discontinued Inderal and prescribed Ambien. *Id*. at 377-78. Later that month, Plaintiff complained to Roberts about difficulty sleeping and stress connected to issues with her children. *Id*. at 376. After seeing Plaintiff on May 31, 2011, Dr. Moussavian determined that Ambien was ineffective and replaced it with Xanax. *Id*. at 375. A few days later, on June 3, 2011, Plaintiff told Roberts that she was less stressed and that her sleep had improved. *Id*. at 374. Later that month, on June 28, 2011, Plaintiff told Dr. Moussavian that her medications were helping her. *Id*. at 373. Dr. Moussavian, in turn, noted that Plaintiff seemed less anxious. *Id*. The CIS Treatment Plan Review Form completed on June 28, 2011indicated that Plaintiff had learned methods of coping with daily stressors and that her sleep had improved, but needed further attention. *Id*. at 404. On July 1, 2011, Roberts informed Plaintiff that CIS would be closing. *Id*. at 372.

Plaintiff's Individualized Treatment Plan and Review, dated July 27, 2011, indicated that her response to treatment continued to be good and that she continued to abstain from using illegal substances. *Id*. at 587. She was maintaining her medical conditions, keeping her appointments, and taking her medications as prescribed. *Id*. Plaintiff intended to contact VESID to let them know she

would like to go to college since she was denied SSI benefits. *Id*. She planned to move to Ecuador with her boyfriend after completing her education. *Id*.

On August 2, 2011, Plaintiff told Roberts that she wanted to move to Florida. *Id*. at 372. Two days later, she told Dr. Moussavian that she was feeling more anxious and having panic attacks. *Id*. at 371. CIS closed on August 12, 2011. *Id*. at 362. Plaintiff's Discharge Summary, dated August 8, 2011, listed diagnoses of GAD, PTSD, ADD, and Opioid Dependence in remission. *Id*. at 369. Among the "Goals Met," Plaintiff had made gains in improving her interpersonal skills, resorted to anger less often, and had acquired tools for stress and anxiety management. *Id*. "Goals Unmet" included having a restful night's sleep and quitting smoking. *Id*. Dr. Moussavian and Roberts planned to continue treating Plaintiff at a private clinic. *Id*. at 370, 608, 617-22.

On August 24, 2011, Plaintiff told Roberts that she was stressed because her VESID application had been lost. *Id*. at 622. On September 2, 2011, Plaintiff told Dr. Moussavian that she was doing well on her medications. *Id*. at 621. Subsequent visits focused on Plaintiff's anticipated move to Florida. *Id*. at 618-20. Plaintiff was discharged from the MMTP at Beth Israel on December 15, 2011, because she was moving out of state. *Id*. at 469-70. She was given information about programs and support services in Florida. *Id*. at 470.

After returning to New York during the summer of 2012, Plaintiff contacted Roberts to resume therapy and medication management. *Id*. at 609-17. During the first session with Roberts, on September 20, 2012, Plaintiff admitted that she had not taken her medications in over two months. *Id*. at 616. On October 1, 2012, Plaintiff saw Dr. Moussavian and complained that she was very anxious during the day, and experienced panic attacks riding the subway. *Id*. Plaintiff was cooperative, but anxious. *Id*. Dr. Moussavian noted that Plaintiff related well and that there

was no evidence of a formal thought disorder. *Id*. He prescribed Celexa, Seroquel, Xanax, and Suboxone. *Id*. On October 15, 2012, Dr. Moussavian noted that Plaintiff was frustrated and overwhelmed as a result of being homeless, and he prescribed Inderal. *Id*. at 615.

In November 2012, Plaintiff was evaluated again at FEGS/WeCARE. *Id*. at 325-52, 357-60. She was not interested in working. *Id*. at 329. She reported a history of ADHD, depression, and suicide attempts, the dates of which she could not recall. *Id*. at 332-33. She claimed to have auditory command hallucinations and provided responses indicating severe depression. *Id*. at 332-33. She stated that she was depressed due to "her life['s] problems." *Id*. at 333. She was receiving psychiatric treatment and was taking Alprazolam, Propranolol, Quetiapine, and Suboxone. *Id*. Plaintiff stated that she could travel independently by bus and train, and could engage in a wide number of daily activities, but did not like to read, watch television, or cook. *Id*. at 333-34.

Plaintiff once again was examined by Dr. Han on November 8, 2012. *Id*. at 344. Much like his previous examination, Dr. Han's November 2012 examination revealed unremarkable findings beyond dentures, straight leg raising to thirty degrees but able to stand and walk on toes and heels, inability to recall the date or name of the President, and a positive Rhomberg's sign. *Id*. Dr. Han diagnosed anemia, unspecified episodic mood disorder, ADD, other specific learning disabilities, Antisocial Personality Disorder, and memory loss (all stable). *Id*. at 344-45. On November 15, 2012, Dr. Robert London ("Dr. London") conducted a psychiatric evaluation and diagnosed mood disorder NOS, ADHD NOS, Cocaine and Opioid Dependence on Axis I and Antisocial Personality Disorder Axis II. *Id*. at 347-50. Dr. London concluded that Plaintiff was able to work full time and was capable of employment in vocational rehabilitation and special supports with accommodation for mood disorder. *Id*. at 349. That same report also indicated that Plaintiff "appears to have chronic mental illnesses . . . with ongoing outp[aiten]t care with restrictions of activities of daily

living that prevent[] adherence to a regular work[k] routine which prevents employment." *Id*. at 350.

On November 19, 2012, Plaintiff saw Dr. Moussavian and reported that she remained drug free and that her current medication regimen was helping her. *Id*. at 611. In a November 19, 2012 note to WeCare, Dr. Moussavian indicated that he was treating Plaintiff for severe anxiety and depression and wrote that Plaintiff was "unable to work at [that] time." *Id*. at 361. The diagnosis was bipolar disorder and her medications were Seroquel, Xanax, and Suboxone. *Id*.

On December 3, 2012, Dr. Moussavian saw Plaintiff and observed that she seemed less anxious and was doing well on her medications. *Id*. at 611.

## E.    Evidence Submitted to the Appeals Council After the ALJ Issued His Decision

The only additional evidence considered by the Appeals Council was a brief submitted by Plaintiff's attorney on her behalf. *Id*. at 5, 231-36.

## DISCUSSION

## A.    Standard of Review

Unsuccessful claimants seeking disability benefits under the Act may appeal the Commissioner's decision by seeking judicial review and bringing an action in federal district court "within sixty days after the mailing . . . of notice of such decision or within such further time as the Commissioner of Social Security may allow." 42 U.S.C. § 405(g). In reviewing the final determination of the Commissioner, a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision. *See Zabala v. Astrue*, 595 F.3d 402, 408 (2d Cir. 2010); *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998). The former determination requires the court to ask whether "the claimant has had a full hearing under the [Commissioner's] regulations and in accordance with the beneficent purposes of the Act."

*Echevarria v. Sec'y of Health & Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982) (internal citations and quotation marks omitted). The latter determination requires the court to ask whether the decision is supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)); *see Schaal*, 134 F.3d at 501. If the district court finds that there is substantial evidence supporting both the claimant's and Commissioner's position, it must rule for the Commissioner, as that position is based on the factfinder's determination. *Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990) (internal citations omitted); *see also DeChirico v. Callahan*, 134 F.3d 1177, 1182 (2d Cir. 1998) (affirming Commissioner's decision where substantial evidence supported either side).

The district court is empowered "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). A remand by the court for further proceedings is appropriate when "the Commissioner has failed to provide a full and fair hearing, to make explicit findings, or to have correctly applied the . . . regulations." *Manago v. Barnhart*, 321 F. Supp.2d 559, 568 (E.D.N.Y. 2004) (internal citations omitted). A remand to the Commissioner also is appropriate "[w]here there are gaps in the administrative record." *Rosa v. Callahan*, 168 F.3d 72, 83 (2d Cir. 1999) (quoting *Sobolewski v. Apfel*, 985 F. Supp. 300, 314 (E.D.N.Y. 1997)). Unlike judges in trial, ALJs have a duty to "affirmatively develop the record in light of the essentially non-adversarial nature of the benefits proceedings." *Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999) (internal citations and quotation marks omitted).

**B.** **Disability Claims**

To receive disability benefits, claimants must be disabled within the meaning of the Act. *See* 42 U.S.C. §§ 423(a), (d). Claimants establish disability status by demonstrating an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). Further, the claimant's impairment must have been of such severity that she is unable to do her previous work or, considering her age, education, and work experience, she could not have engaged in any other kind of substantial gainful work that exists in the national economy. 42 U.S.C. § 1382c(a)(3)(B). The claimant bears the initial burden of proving disability status by presenting "medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, which show the existence of a medical impairment that results from anatomical, physiological, or psychological abnormalities which could reasonably be expected to produce the pain or other symptoms alleged" and which leads to the conclusion that the individual has a disability. 42 U.S.C. §§ 423(d)(5)(A), 1382c(a)(3)(A), (D); *see also Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983).

ALJs must adhere to a five-step inquiry to determine whether a claimant is disabled under the Social Security Act, as set forth in 20 C.F.R. §§ 404.1520 and 416.920. The inquiry ends at the earliest step at which the ALJ determines that the claimant is either disabled or not disabled. First, the claimant is not disabled if she is working and performing "substantial gainful activity." 20 C.F.R. §§ 404.1520(b), 416.920(b). Second, the ALJ considers whether the claimant has a "severe impairment," without reference to age, education, and work experience. Impairments are "severe" if they significantly limit a claimant's physical or mental ability to conduct basic work activities.

If the claimant does not have a severe impairment, she is not disabled. 20 C.F.R. §§ 404.1520(c), 416.920(c). Third, the ALJ will find the claimant disabled if her impairment meets or equals an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1 (the "Listings"). *See* 20 C.F.R. §§ 404.1520(d), 416.920(d).

If the claimant does not have a listed impairment, the ALJ makes a finding about the claimant's residual functional capacity ("RFC") in steps four and five. 20 C.F.R. §§ 404.1520(e), 416.920(e). At the fourth step, the claimant is not disabled if she possesses the RFC to perform past relevant work. 20 C.F.R. §§ 404.1520(f), 416.920(f). RFC is defined in the applicable regulations as "the most [the claimant] can still do despite [her] limitations." 20 C.F.R. § 404.1545(a)(1). To determine RFC, the ALJ makes a "function by function assessment of the claimant's ability to sit, stand, walk, lift, carry, push, pull, reach, handle, stoop, or crouch . . . ." *Sobolewski v. Apfel*, 985 F. Supp. 300, 309 (E.D.N.Y. 1997). The results of this assessment determine the claimant's ability to perform the exertional demands of sustained work and may be categorized as sedentary, light, medium, heavy, or very heavy. 20 C.F.R. § 404.1567.

Finally, at the fifth step, the ALJ considers factors such as age, education, and work experience alongside her RFC to determine whether the claimant could adjust to other work that exists in the national economy. If the claimant could make such an adjustment, she is not disabled. 20 C.F.R. §§ 404.1520(g), 416.920(g). At this final step, the burden shifts to the Commissioner to demonstrate that the claimant could perform other work. *See Draegert v. Barnhart*, 311 F.3d 468, 472 (2d Cir. 2002) (citing *Carroll,* 705 F.2d at 642).

## C.     The ALJ's Decision

On March 20, 2013, the ALJ issued a decision denying Plaintiff's claims. R. at 17-34. The ALJ followed the five-step process in making his determination that Plaintiff had the RFC to

perform a full range of work at all exertional levels with certain non-exertional limitations. *See Id*. at 22-28. At the first step, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since March 24, 2011, the protective date of her SSI application. *Id*. at 22. At the second step, the ALJ found the following severe impairments: anxiety disorder, PTSD, bipolar disorder, and polysubstance abuse in early remission. *Id*. At the third step, the ALJ concluded that Plaintiff's impairment or combination of impairments did not meet or medically equal the severity of one of the impairments in the Listings. *Id*. at 22-24.

At the fourth step, the ALJ found that Plaintiff could perform a full range of work at all exertional levels, but with the additional limitations:

> [Plaintiff] is limited to the performance of simple, routine, and repetitive tasks that can be explained; which involve making simple decisions, and only occasional changes in routine. The work must be entry level and unskilled in nature. [Plaintiff] is limited to brief and superficial contact with others.

*Id*. at 24. The ALJ wrote that he determined the RFC by considering the objective medical evidence in the record, opinion evidence, and reported symptoms to the extent that those symptoms were reasonably consistent with the objective medical evidence. *Id*. The ALJ determined that Plaintiff's severe impairments caused "more than a minimal effect on [her] ability to perform basic work activities," she had "mild" restrictions in social functioning and activities of daily living, and she suffered from "moderate difficulties" as to concentration, persistence, or pace. *Id*. at 22-23. The ALJ found no episodes of decompensation in the record. *Id*. at 23.

Accordingly, the ALJ proceeded to step four. At step four, the ALJ found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely credible" in light of the evidence in the record. *Id*. at 25. The ALJ's conclusion was drawn from the fact that Plaintiff repeatedly denied mental health problems, symptoms of depression,

hallucinations, generally showed no signs of disorders, and regularly indicated a desire to acquire more education. *See Id.* at 25-26.

The ALJ took issue with Dr. Moussavian's "multiple inconsistent opinions" concerning Plaintiff's ability to work. *Id.* at 27. As explained by the ALJ:

> The opinions from Dr. Moussavian are assigned little weight. The opinions are inconsistent: for example, the doctor stated she was unable to work for at least twelve months, and then two weeks later in a different form he stated that she had a good work estimate. The opinions as to the claimant being unable to work are not well supported and do not include functional limitations. The opinions are also not consistent with the relatively infrequent treatment and the progress notes, which regularly show the claimant was stable when complying with conservative care.

*Id.* Ultimately, given the parameters of her RFC, the ALJ found that Plaintiff was unable to perform her past relevant work as a fast food worker and that her non-exertional limitations limited the occupational base of unskilled work at all exertional levels. *Id.* at 28-29. The ALJ sought the opinion of the VE to determine whether jobs exist in the national and regional economy for an individual with Plaintiff's RFC. *Id.* at 29. Relying upon the VE's testimony, the ALJ found three occupations, garment folder, garment sorter, and ticket printer tagger, in the national and regional economies for an individual with Plaintiff's characteristics based upon the information contained in the *Dictionary of Occupational Titles*. *Id.*

At the fifth step, considering Plaintiff's age, education, work experience, RFC, and the VE's testimony, the ALJ concluded that "the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy." *Id.*

**D.    Analysis**

The Commissioner moves for judgment on the pleadings, asking this Court to affirm the denial of Plaintiff's benefits on the grounds that the ALJ applied the correct legal standards to find

that Plaintiff was not disabled and that the factual findings were supported by substantial evidence. *See generally*, Def. Mem. Plaintiff cross-moves for judgment on the pleadings, opposing the Commissioner's motion and seeking remand, arguing that: (1) the ALJ failed to apply the correct standard when assessing the materiality of drug and alcohol addiction; (2) the ALJ failed to recognize Plaintiff's ADHD as a severe medically determinable impairment; (3) the ALJ failed to properly weigh the medical evidence; (4) the RFC is not supported by substantial evidence; and (5) the ALJ failed to establish that there are a sufficient number of jobs in the national economy which Plaintiff can perform. *See generally*, Pl. Mem. Upon review, the Court finds that the ALJ did not apply properly analyze Plaintiff's substance abuse, failed to develop the record as to Plaintiff's ADHD, and improperly rejected Dr. Moussavian's opinions.

### i. Unchallenged Findings

The ALJ's findings as to step one is unchallenged. *See generally*, Def. Mem.; Pl. Mem.; Def. Reply. Upon a review of the record, the Court concludes that the ALJ's findings as to step one are supported by substantial evidence.

### ii. The ALJ Must Separate Alleged Disabilities from Substance Abuse

Plaintiff argues that the ALJ erred by not stating specifically whether addiction was a material contributing factor to her disability. Pl. Mem. at 15. Plaintiff further submits that, "[a]pplication of the correct standard would justify a conclusion that [she] is disabled." *Id*. at 16. Although the Court rejects Plaintiff's specific argument, it nevertheless finds error in the ALJ's five-step analysis.

When an ALJ conducts his initial five-step inquiry into whether a claimant qualifies as "disabled" under the Act, he may not consider whether a claimant's substance abuse problems contribute to the disability. *See Piccini v. Comm'r of Soc. Sec.*, No. 13-CV-3461 (AJN) (SN), 2014 WL 4651911, at *15 (S.D.N.Y. Sept. 17, 2014) (collecting cases). Rather, it is incumbent upon the

ALJ to conduct the initial analysis "without segregating out any effects that might be due to substance abuse disorders." *Day v. Astrue*, No. 07-CV-157 (RJD), 2008 WL 63285, at *5 (E.D.N.Y. Jan. 3, 2008) (quoting *Brueggemann v. Barnhart*, 348 F.3d 689, 695 (8th Cir. 2003)). If an ALJ determines that a claimant is not disabled after the five-step process, no further inquiry is required. If, however, an ALJ finds that a claimant is disabled and that the individual's medical records indicate substance abuse problems, "the inquiry does not end with the five step analysis." *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 123 (2d Cir. 2012) (internal citation omitted); *see also* 20 C.F.R. § 416.935(a) ("If we find that you are disabled and have medical evidence of your drug addiction or alcoholism, we must determine whether your drug addiction or alcoholism is a contributing factor . . . ."). The reason that substance abuse is analyzed separate and apart from other mental or physical impairments is because a claimant is not considered disabled "if alcoholism or drug addiction . . . [is] a contributing factor material to the Commissioner's [disability] determination that the individual is disabled." 42 U.S.C. § 1382c(a)(3)(J).

Here, Plaintiff's arguments presuppose the conclusion that the ALJ found her disabled; that is not how the ALJ ruled. Since the Regulations only contemplate an analysis concerning the materiality of drug and/or alcohol abuse after a claimant is found disabled at step five, the Court rejects Plaintiff's argument attacking the ALJ's analysis for a failure to conduct a materiality inquiry. However, upon review, the Court finds fault in the ALJ's analysis, as he consistently referenced Plaintiff's substance abuse, and linked her ability to comply with prescribed treatment regimens to her continued sobriety. *See Id*. at 25-28. In fact, the ALJ wrote:

> The record indicates that claimant's primary issue is polysubstance abuse. To the claimant's credit, she was active with drug treatment during much of the relevant period with sustained periods of sobriety. However, during periods of sobriety and treatment compliance, the claimant appeared to be doing well, and she was participating in VESID and was looking into returning to work.

*Id.* at 25. Upon further analysis, the ALJ might very well find that substantial evidence still supports a finding that Plaintiff is not disabled within the meaning of the Act. However, given the references to substance abuse, as exemplified in the passage quoted above, the Court cannot conclude with certainty that the ALJ did not conflate Plaintiff's substance abuse with her claimed underlying disabilities. *See Piccini*, 2014 WL 4651911, at *15 (internal citations omitted); *Day*, 2008 WL 63285, at *5 (internal citations omitted).

On remand, the ALJ is instructed to repeat the five-step analysis, "without segregating out any effects that might be due to substance abuse disorders." *Day*, 2008 WL 63285, at *5 (internal citations omitted). If the ALJ once again determines that Plaintiff is not disabled, he need not address the materiality of Plaintiff's substance abuse. If, however, the ALJ concludes that Plaintiff is disabled and that there is evidence of substance abuse in the record, he then must assess whether Plaintiff still would be considered disabled under the Act, if she stopped her substance abuse. *Cage*, 692 F.3d at 123 (quoting 20 C.F.R. § 416.935(b)(1)).

### iii.    *Plaintiff's Alleged Attention Deficit Hyperactivity Disorder ("ADHD")*

Plaintiff also claims the ALJ improperly concluded that her alleged ADHD was not an impairment and that this finding is not supported by substantial evidence. Pl. Mem. at 12-15. She argues that the "multiple" diagnoses of ADHD support a finding that she suffered from a medically determinable impairment.[9] *Id.* at 12. Plaintiff contends that, at the very least, the ALJ had a duty to develop the record as to the impact of her ADHD. *Id.* at 15. While the Court rejects Plaintiff's

---

[9] The prevalence of this diagnosis is not as great as Plaintiff suggests in her papers. In fact, she cites to portions of the record containing medical notes that simply reflect *her own* recollection of her diagnosis history. *See* R. at 341 ("Current Medical Conditions Related to Employment As Described by Applicant"); 348 ("44 y/o female reports a hx of mood swings, memory loss and ADHD."); 358 (same). Citations to a "rule out" diagnoses are similarly of no significance, as a "rule out" diagnosis is not, in itself, a diagnosis. *Santiago v. Colvin*, No. 12-CV-7052 (GBD) (FM), 2014 WL 718424, at *13 (S.D.N.Y. Feb. 25, 2014) (internal citations omitted), *report and recommendation adopted by* 2014 WL 1092967 (S.D.N.Y. Mar. 17, 2014).

apparent position that a repeated diagnosis *ipso facto* should result in a finding of an impairment, the Court agrees that the ALJ failed to develop the record with respect to her alleged ADHD.

The administrative proceedings surrounding Social Security benefit determinations are deemed "inquisitorial." *Sims v. Apfel*, 530 U.S. 103, 111 (2000). The result is that the ALJ has "an affirmative obligation to develop the administrative record." *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996) (citing *Echevarria,* 685 F.2d at 755). This duty exists regardless of whether a claimant has representation. *Id.* (internal citations omitted). Correspondingly, the ALJ also has a responsibility to "investigate the facts and develop the arguments both for and against granting benefits." *Sims*, 530 U.S. at 111. "The ALJ must therefore seek additional evidence or clarification when the report[s] from claimant's medical source[s] . . . do[] not appear to be based on medically acceptable clinical and laboratory diagnostic techniques." *Straughter v. Comm'r of Soc. Sec.*, No. 12-CV-825 (DAB) (DCF), 2015 WL 6115648, at *11 (S.D.N.Y. Oct. 16, 2015) (internal citations and quotation marks omitted). If the ALJ failed to develop the administrative record, remand is appropriate. *Butts v. Barnhart*, 388 F.3d 377, 385-86 (2d Cir. 2004); *see also Kirkland v. Astrue*, No. 06-CV-4861 (ARR), 2008 WL 267429, at *8 (E.D.N.Y. Jan. 29, 2008) ("Remand for additional proceedings is particularly appropriate where, due to inconsistences in the medical evidence and/or significant gaps in the record, further findings would plainly help to assure the proper disposition of a claim.") (internal citations and quotation marks omitted).

There is no dispute that Plaintiff was diagnosed with ADHD and claimed it was an impairment affecting her ability to work. R. at 22, 24, 350, 395. Yet, at the second step of the analysis, the ALJ determined that "[t]he record does not show any testing that supports ADHD. [Plaintiff] reported that she completed high school and was not in special education. Accordingly, the record does not support a diagnosis of ADHD." *Id.* at 22 (internal citations omitted). Instead

of asking Plaintiff about her ADHD during the hearing or seeking any clarification concerning the methods of diagnosis and lack of evidence in the record, the ALJ chose to disregard the diagnosis and its impact; this was legal error. *Rosa*, 168 F.3d at 79 (internal citations omitted).

The Court finds that the ALJ erred by failing to inquire further about Plaintiff's ADHD diagnosis before summarily dismissing it. On remand, the ALJ shall make all reasonable efforts to develop the record by seeking information from the physicians who diagnosed ADHD. Specifically, the ALJ must determine how the physicians arrived at their diagnoses and request opinions as to how Plaintiff's ADHD limits her ability to work, if at all. The ALJ also must examine Plaintiff and inquire how her ADHD manifests itself and what specific difficulties are associated with that condition. After developing the record with this information, the ALJ is to reevaluate his assessment of Plaintiff's ADHD and whether it is a severe impairment that meets or medically equals one of the listed impairments in 20 C.F.R. § 404, Subpt. P, App'x 1. After this reevaluation, however, the ALJ may still find that Plaintiff's ADHD is not a "severe impairment," since "[s]tanding alone, a diagnosis of ADHD does not establish a disability under the Act." *F.S. v. Astrue*, No. 10-CV-444 (MAD), 2012 WL 514944, at *11 (N.D.N.Y. Feb. 15, 2012) (citing *Tackett v. Apfel*, 180 F.3d 1094, 1099 (9th Cir. 1999)).

### iv.     *The Treating Physician's Opinions*

Plaintiff's next complaint is that the ALJ erred by assigning "little weight" to Dr. Moussavian's opinions. Pl. Mem. at 18-20. For the reasons outlined below, the Court agrees that the ALJ did not assess properly the physician's opinions.

The Social Security Administration recognizes that treating physicians offer a "unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations" performed by other individuals. 20 C.F.R. §

404.1527(c)(2). That being the case, "If [the Social Security Administration] finds that a treating source's opinion on the issue(s) of the nature and severity of [a claimant's] impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques *and* is not inconsistent with the other substantial evidence in the record," it will be given controlling weight. *Id*. (emphasis added); *see also Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013) (internal citations omitted).

In the event that the ALJ believes that the treating physician's opinion does not deserve controlling weight, he or she must consider: (1) the "[l]ength of the relationship and the frequency of examination;" (2) the "[n]ature and extent of the treatment relationship;" (3) the evidence supporting the opinion; (4) the consistency of the opinion "with the record as a whole;" (5) whether the physician is a specialist; and (6) other factors brought "to [the Social Security Administration's] attention, or of which [it] is aware, which tend to support or contradict the opinion." 20 C.F.R. §§ 404.1527(c)(2)(i)-(ii), (3)-(6); *see also Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (internal citations omitted). While specifically outlining the consideration of these factors is helpful to a reviewing court, "where the evidence of record permits us to glean the rationale of an ALJ's decision, we do not require that he have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability." *Petrie v. Astrue*, 412 F. App'x 401, 407 (2d Cir. Mar. 8, 2011) (internal citations and quotation marks omitted). The ALJ must, however, "comprehensively set forth reasons for the weight assigned to a treating physician's opinion." *Halloran*, 362 F.3d at 33; *see also* 20 C.F.R. § 404.1527(c)(2) (the Social Security Administration "will always give good reasons in [its] notice of determination or decision for the weight" given to treating physician opinions); *Schaal*, 134 F.3d at 505. Under no circumstances can the ALJ

"substitute his own expertise or view of the medical proof for the treating physician's opinion or for any competent medical opinion." *Greek v. Colvin*, 802 F.3d 370, 376 (2d Cir. 2015) (internal citations omitted).

In considering Dr. Moussavian's opinions, the ALJ found that they deserved "little weight" overall. He reached this conclusion by reasoning that Dr. Moussavian's various opinions concerning Plaintiff's ability to work were inconsistent with each other and that, when Dr. Moussavian found Plaintiff was unable to work, the opinions were not well supported, did not include functional limitations, and were otherwise inconsistent with "the relatively infrequent treatment and the progress notes." R. at 27. None of these reasons withstand the Court's review.

When the ALJ detected inconsistencies in Dr. Moussavian's opinions, which he believed undermined the opinion of that treating physician, as discussed above, he had a duty to develop the administrative record to try and reconcile the contradictions and fill in those gaps. When the "ALJ perceives inconsistences in a treating physician's reports, the ALJ bears an affirmative duty to seek out more information from the treating physician and to develop the record accordingly." *Hartnett v. Apfel*, 21 F. Supp.2d 217, 221 (E.D.N.Y. 1998) (internal citations omitted); *see also Schaal*, 134 F.3d at 505 (explaining that when an ALJ determines "clinical findings were inadequate," he or she has a duty to "seek additional information from [the treating physician] *sua sponte*.") (internal citations omitted). While the ALJ must consider statements concerning Plaintiff's ability to work, they do not bind him. *See Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) ("A treating physician's statement that the claimant is disabled cannot itself be determinative."); *Guzman v. Astrue*, No. 09-CV-3928 (PKC), 2011 WL 666194, at *10 (S.D.N.Y. Feb. 4, 2011) ("[A] treating physician's opinion that the claimant is 'disabled' or 'unable to work' is not controlling.") (internal citations omitted).

A review of the record shows that the ALJ failed to carry his burden and never asked Dr. Moussavian, Plaintiff, or counsel for additional information in order to reconcile the inconsistencies or clarify Plaintiff's functional limitations.

Furthermore, "[u]nder the treating physician rule, an ALJ may not reject a treating physician's opinion based solely on such conclusory assertions of inconsistency with the medical record." *Marchetti v. Colvin*, No. 13-CV-2581 (KAM), 2014 WL 7359158, at *13 (E.D.N.Y. Dec. 24, 2014); *see also Burgess v. Astrue*, 537 F.3d 117, 129-30 (2d Cir. 2008) (vacating and remanding in light of the ALJ's failure to proffer "good reasons" for discounting a treating physician's opinion). As such, when the ALJ determined that Dr. Moussavian's opinions were "not well supported" and "not consistent with the relatively infrequent treatment and the progress notes," it was incumbent upon him to identify precisely what he relied upon in reaching that conclusion; he did not do so. The Court cannot accept such conclusory statements as reasons for refusing to give Dr. Moussavian's opinions controlling weight.

Relatedly, there is no indication that the ALJ, in fact, did consider all the necessary factors before disregarding Dr. Moussavian's opinions. There is no discussion of whether Dr. Moussavian is a specialist, the length of his relationship with Plaintiff, or the consistency of any of his opinions "with the record as a whole." The ALJ does make a fleeting reference to "infrequent treatment," but this conclusion is belied by the record. Dr. Moussavian saw Plaintiff approximately once a month from October 2010 to August 2011 and, after a brief hiatus, continued seeing Plaintiff upon her return from Florida in 2012. *See Id.* at 363-64, 616.

On remand, the ALJ might very well be correct in his conclusion that Dr. Moussavian's opinion deserves "little weight," but, he must develop the record, consider all factors, and tender lucid, reasoned explanations for his conclusions based upon the evidence before him. Accordingly,

on remand, the ALJ is to reassess the opinions of Dr. Moussavian after securing at least the following from him: (1) clarification as to what Plaintiff's specific functional limitations are (and how he arrived at those functional limitations, if any); and (2) an explanation as to how he reached facially inconsistent opinions concerning Plaintiff's ability to work.[10]

### v.    *Plaintiff's Remaining Arguments*

Plaintiff's remaining arguments are that the RFC is not supported by substantial evidence and that the ALJ failed to establish that there are a sufficient number of jobs in the national economy that Plaintiff can perform. *See* Pl. Mem. at 20-25. However, because the Court has determined that remand is appropriate to address errors in the ALJ's analysis of substance abuse, assessment of severe impairments, and weighing of a treating physician's opinions, it need not and does not consider the remaining arguments. *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987) ("Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles."); *see also Rivera v. Comm'r of Soc. Sec.*, 728 F. Supp. 2d 297, 331 (S.D.N.Y. 2010) ("Because I find legal error requiring remand, I need not consider whether the ALJ's decision was otherwise supported by substantial evidence.") (internal citations omitted); *Edel v. Astrue*, No. 06-CV-0440 (LEK) (VEB), 2009 WL 890667, at *24 (N.D.N.Y. Mar. 30, 2009) ("As the Court has already recommended remand based on the ALJ's . . . RFC analys[is], the ALJ's application of the grid at step five is necessarily flawed, preventing the Court from appropriately analyzing the RFC determination.").

---

[10] The Court also notes that the ALJ references the fact that "Plaintiff was stable when complying with conservative care" as a reason for finding Dr. Moussivan's opinions inconsistent. R. at 27. Given the context, it seems to be an allusion to Plaintiff's substance abuse problems. This further strengthens the Court's determination that the ALJ must re-evaluate the five-step analysis discussed *supra*.

**<u>CONCLUSION</u>**

For the reasons set forth above, the Commissioner's motion for judgment on the pleadings is denied, Plaintiff's cross-motion for judgment on the pleadings is granted, the decision of the Commissioner is reversed, and this matter is remanded to the Commissioner pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further administrative proceedings consistent with this Opinion. If Plaintiff's benefits remain denied, the Commissioner is directed to render a final decision within sixty (60) days of Plaintiff's appeal, if any. *See Butts*, 388 F.3d at 387 (suggesting procedural time limits to ensure speedy disposition of Social Security cases upon remand by district courts).

SO ORDERED.

Dated: Brooklyn, New York
       March 27, 2017

_____
          /s/
DORA L. IRIZARRY
Chief Judge